# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| AIR VENT, INC. and GIBRALTAR INDUSTRIES, INC., | § § § | |
| Plaintiffs, | § | |
| vs. | § § | CIVIL ACTION NO. _____ |
| POWERMAX ELECTRIC CO., LTD., | § § § | |
| Defendant. | § | |

## PLAINTIFFS' COMPLAINT

Plaintiffs files this Complaint against Defendant Powermax Electric Co., Ltd. and would respectfully show as follows:

## PARTIES

1. Plaintiff Air Vent, Inc. ("AVI") is a Delaware corporation with its principal place of business located at 4117 Pinnacle Point Drive, Suite 400, Dallas, Texas 75211.

2. Plaintiff Gibraltar Industries, Inc. ("Gibraltar") is a Delaware corporation with its principal place of business located at 4117 Pinnacle Point Drive, Suite 400, Dallas, Texas 75211.

3. Defendant Powermax Electric Co., Ltd, Guangdong ("Powermax") is a foreign corporation based in China that designed, manufactured and/or otherwise placed the subject fan motor in the stream of commerce and purposefully availed itself of the rights and benefits of the State of Texas so that it would be reasonably foreseeable that it would be subject to the laws of the State of Texas relating to this product. Powermax's principal place of business is located at 1-2 Region, South of Quibao Industries, Xinhui District, Jiangmen City, Guangdong, China 529100. Powermax can be served through the Hague Convention.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that it is an action between citizens of different states and the amount in controversy exceeds $75,000.

5. This Court has personal jurisdiction over Powermax because Plaintiffs' claims arise from Powermax:

- transacting business in the State of Texas;
- contracting to supply goods in the State of Texas; and/or
- causing tortious injury by an act or omission in the State of Texas.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## JURISDICTIONAL ALLEGATIONS

7. AVI and Gibraltar (hereinafter referred to collectively as "Plaintiffs") manufacture and sell powered attic ventilation products, some of which include ventilation fans powered by electric motors. All electric powered attic ventilation fans sold by Plaintiffs include fan motors designed and manufactured by third parties. All third-party motor manufacturers design, manufacture and sell their motors to Plaintiffs and other fan manufacturers. All fan motors included in Plaintiffs' fans are purchased by Plaintiffs from third-parties as completely assembled, ready-to-install units that comply with all UL requirements for manufacturing and safety.

8. Prior to the year 2000 and up thru the November 2012, Plaintiffs purchased millions of electric fan motors from Powermax. From 2003-2012, Plaintiffs purchased approximately Two Million Eight Hundred Seventy-Nine Thousand, Seven Hundred Thirty-Three (2,879,733) electric fan motors from Powermax. All Powermax fan motors were designed, manufactured, marketed

and sold by Powermax in Guangdong China and were shipped directly to Plaintiffs from the Powermax facility in Guangdong, China.

9.  As described more fully herein, Powermax motors were designed, manufactured, marketed, and sold to Plaintiffs for inclusion in manufactured fan components and were intended for distribution throughout the United States. With the knowledge and agreement of Powermax and its agent/joint venture partners, Plaintiffs incorporated Powermax electric motors in its completed fans which were distributed throughout the United States, from before 2003 thru at least the end of 2012.

10. All fan motors manufactured by Powermax for Plaintiffs were purchased "in bulk" through the issuance of purchase orders to DM Asia ("DMA"), the marketing agent/partner for Powermax. The purchase orders would have been sent to Powermax thru DMA for each and all of the 2,879,733 Powermax motors purchased in bulk by Plaintiffs. These purchase orders are kept and maintained by Plaintiffs. All electric motors purchased by Plaintiffs thru Purchase Orders to DMA were manufactured by Powermax at its Guangdong China facility, and were sent directly from Powermax in Guangdong China thru ports in California, Florida, Virginia and Texas for final delivery to Plaintiffs. DMA is not a manufacturer and has no manufacturing facility. Instead, according to Peter Cheung (DMA's sales representative for Powermax) and the Underwriters Laboratory Follow-Up Service Procedure (a UL document provided by DMA to Plaintiffs), Powermax Electric Co. Ltd., Guangdong is the sole manufacturing facility for all electric motors sold by or thru DMA. DMA acted as Powermax's U.S. distributor, and Powermax did nothing to limit the sale of its fan motors or to prevent them from being sold in Texas, the second most populous state in the U.S.

12.    UL certification is a specific requirement by the National Electrical Code in the United States.  A UL certification means the product meets United States equipment condition requirements and OSHA standards for US applications.

13.    From 2003 thru 2011, Powermax periodically sent invoices directly to Plaintiffs for fan motors manufactured by Powermax.  At least 91,354 Powermax fan motors were invoiced directly from Powermax to Plaintiffs.  Powermax invoices to Plaintiffs show bulk shipments of Powermax motors shipped directly to Dallas Texas, for the years 2003, 2004, 2005, 2007 and 2011.  Other Powermax fan motors were sometimes invoiced by DMA.  All Powermax manufactured motors, regardless of whether they were invoiced to Plaintiffs by Powermax or DMA, were shipped directly from the Powermax manufacturing facility in Guangdong China to Plaintiffs' acilities in Dallas, Texas and were intended for sale and distribution throughout the United States.  Although Powermax alleges that title to the Powermax motors invoiced through DMA passed to DMA in China, DMA never took physical possession of those motors.  Instead, the motors were shipped directly from the Powermax manufacturing facility in Guangdong China to Plaintiffs' facilities in Dallas.

14.    Each and every purchase order issued by Plaintiffs to purchase Powermax motors contained "Purchase Order Terms and Conditions" (hereinafter sometimes "POTCs").  During the years Plaintiffs purchased motors from Powermax, Plaintiffs were aware of two (2) forms of POTCs issued by Plaintiffs that have substantially similar language as it concerns the product quality and indemnity provisions.

15.    Through the POTCs, the Supplier (in this case Powermax) agreed to accept and ship all manufactured goods (specifically electric fan motors) pursuant to terms stated in the purchase orders and the POTCs.  Pursuant to the POTCs, the Supplier (in this case Powermax)

warrantied, among other things, that all goods shipped pursuant to the purchase orders would conform to the motor specifications, drawings and samples provided to Plaintiffs; be free from defects in design, material and workmanship; be of merchantable quality and be suitable for use for the particular purposes intended; and would bear all warnings, labels and markings required by applicable laws and regulations.  Pursuant to the POTCs, the Supplier (in this case Powermax) agreed to indemnify, defend and hold harmless Plaintiffs and their affiliates from and against all claims, demands, causes of action, losses, costs and expenses (including without limitation reasonable attorneys' fees and costs of defense) arising out of or incident to the motor manufacturer's performance under the purchase orders.  The Supplier (in this case Powermax) also agreed that all agreements and representations in the POTCs, including specifically those regarding indemnification and warranties, shall survive delivery and final payment; agreed to and expressly waived any rights the manufacturer might have to assert any immunities or defenses to the indemnity agreement,  and agreed that all rights and remedies available to Plaintiffs pursuant to the POTCs are in addition to and not in limitation of any rights and remedies otherwise available to Plaintiffs at law or in equity

16.     In about 2012, representatives from DMA and Powermax met with Plaintiffs' representatives (Tracy Straughan and John Wagner) at the Powermax manufacturing facility in Guangdong China in order to give them a tour of the manufacturing facility where all motors sold to Plaintiffs from Powermax were being manufactured.  Plaintiffs' representatives explained that AVI and Gibraltar were based in Dallas, Texas, that they were large purchasers of  Powermax fan motors and that they incorporated those fan motors into their attic fans sold throughout the United States.  Plaintiffs' representatives were taken to a manufacturing facility named Powermax Electric Co., Ltd. in Guangdong China, where they observed motors coming off the production line that

were being shipped and sold to AVI and Gibraltar. Representatives from DMA and Powermax again confirmed that all motors purchased by Plaintiffs were manufactured by Powermax at the Guangdong China facility and were being shipped directly from Powermax to Plaintiffs in Dallas, Texas.

17. Between 2005 and 2014, a representative of Plaintiffs attended product inspections of Powermax manufactured motors along with representatives from Powermax. These inspections took place in various places in the State of Texas.

18. AVI has been involved in litigation with DMA with regard to the failure of Powermax manufactured motors. In some of those cases, discovery has been exchanged. Peter Cheung, the DMA representative in those cases, has offered verification/affidavits in those cases confirming that all fan motors purchased thru POs issued to DMA were manufactured, sold and shipped from Powermax directly to Plaintiffs. Peter Cheung confirmed that all (2,879,733) Powermax motors sold thru DMA to Plaintiffs were manufactured by Powermax and were shipped directly from the Powermax manufacturing facility to Plaintiffs in Dallas, Texas.

19. There are "Mainstays" brand ceiling fans available for purchase at the Walmart in Rockwall, Texas and in Houston, Harris County, Texas. According to the packaging and carton, Powermax is the manufacturer for these products sold to and through Walmart and it appears the products were shipped directly from Powermax to Walmart. There are also "Hampton Bay" brand ceiling fans available for purchase at a Home Depot in Rockwall, Texas. According to the carton and the packaging, Powermax is the manufacturer for these products sold to and thru Home Depot and the products are shipped directly from Powermax to Home Depot or one of its trade partners. All of the ceiling fans designed, manufactured, marketed and sold by Powermax through Walmart locations in Texas contain a fan motor designed, manufactured, marketed and sold by Powermax.

20. According to the insurance certificates issued by AIG Insurance Company of China and Chartis Insurance Company, the Powermax manufactured roof ventilators and fan motors have coverage for products sold "Worldwide, except Syria, Burma (Myanmar), Cuba, Iran and Sudan." The Chartis policies covering Powermax products include coverage for products sold "Worldwide Including USA/Canada/U.K." The AIG and Chartis policies also include Product Indemnification Agreements between Powermax and the "additional insured" Powermax was required to add to its insurance policies.

21. Powermax has sought to improperly use its American business model as a shield. Powermax deliberately, not fortuitously, directs its products into the stream of commerce through its distribution channel to the entire United States, including Texas. Powermax was aware, and intended, that its motors would be sold to consumers throughout the United States, including Texas. Powermax delivered its fan motors into the stream of commerce with the expectation that they would be purchased by or used by consumers in Texas. Powermax used DM Asia as its U.S. distributor and did nothing to limit the sale of its motors or prevent them from being sold in Texas, the second most populous state. Powermax complied with all Underwriters Laboratory requirements for fan motors to be sold in the U.S. Powermax received substantial revenue from the sale of its motors to consumers in Texas. Simply put, Powermax targeted Texas, was aware its products would reach consumers in Texas and purposefully availed itself of the privilege of doing business in Texas with Texas consumers.

## **FACTS COMMON TO ALL CAUSES OF ACTION**

22. Plaintiffs are manufacturers and sellers of attic ventilation products. Some of the products sold by Plaintiffs include powered attic ventilation fans. All powered attic ventilation fans sold by Plaintiffs include completed fan motors manufactured by third parties. Third-party

motor manufacturers design, manufacture and sell their motors to Plaintiffs as completed units. All fan motors included in Plaintiffs' fans are purchased by Plaintiffs as completely assembled, ready to install units.

23. Plaintiffs do not manufacture any motorized, energized or powered component in their fan assemblies that are capable of failing in a way that could possibly be an ignition source for, or the cause of, a fire. Plaintiffs' completed products were and are approved by Underwriters Laboratories ("UL") and comply with all UL safety standards.

24. In July 2018, State Farm General Insurance Company ("State Farm") filed a complaint in the Superior Court of Los Angeles under Case Number BC714781 (the "Chaja Lawsuit"). The Chaja Lawsuit alleged that the home of State Farms' insureds, Kevin and Natasha Chaja, sustained damages from a fire caused by an attic fan (the "Subject Fan") sold by Plaintiffs. If that is true, the only possible reason would be a defect in the Powermax Fan Motor (the "Fan Motor") manufactured and shipped by Powermax, which was incorporated without modification into the subject Attic Fan.

25. Plaintiffs did not design or participate in the design of the Fan Motor. Rather, the Fan Motor was manufactured by Powermax and was sold to Plaintiffs by Powermax, KOF and/or DMA and then shipped directly from Powermax to Plaintiffs in Dallas, Texas for incorporation into the Subject Fan.

26. Plaintiffs did not in any way change, modify, or alter the Fan Motor. Plaintiffs installed the Fan Motor at issue into its fan housing in good and workmanlike manner by attaching the motor to the housing. Nothing Plaintiffs did or did not do could have contributed in any way to a failure of the Fan Motor or the fire that was the subject of the Chaja Lawsuit.

27. In the Chaja Lawsuit, Plaintiffs filed cross-claims against Powermax. Powermax filed a special appearance and a motion to dismiss for lack of jurisdiction. After considering the pleadings of the parties, the California court granted Powermax's motion. In doing so, it applied the "stream of commerce plus" test rather than the "stream of commerce" test utilized by courts within the Fifth Circuit. The California court also relied on Justice O'Connor's plurality opinion in *Asahi Metal Industry Co. v. Superior Court of California, Solano County,* 480 U.S. 102 (1987) rather than Justice Brennan's concurrence. And it accepted the plurality opinion of Justice Kennedy in *J. McIntyre Machinery Ltd. v. Nicastro,* 564 U.S. 873 (2011) rather than the reasoning of Justice Breyer's concurring opinion, which the Fifth Circuit follows. Applying the stricter "stream of commerce plus" test, the California court held that it lacked jurisdiction over Powermax because it lacked purposeful contact with California:

> The motors were "shipped directly from the Powermax manufacturing facility" to Air Vent "facilities in Dallas, Texas and were intended for sale and distribution throughout the United States."

> None of this evidence shows purposeful contact with the State of California. Cross-complainants Air Vent and Gibraltar are Delaware corporations with principal places of business in Dallas, Texas. That Powermax products may have travelled through California courts is a minimal and insufficient contact insufficient for purposeful availment.

Following dismissal of its cross-claims against Powermax, Plaintiffs are now filing the instant case to pursue those claims in this forum.

## CAUSES OF ACTION

### First Cause of Action: Statutory Indemnity

28. Plaintiffs incorporate the allegations of paragraphs 1 through 27 above as if fully set forth herein.

29. Pursuant to Chapter 82, *et. seq.* of the Texas Civil Practice and Remedies Code, Powermax is a "manufacturer" of the Fan Motor that is alleged to be defective. Plaintiffs were

and are innocent sellers of the Fan Motor. As such, Powermax has an independent duty to indemnify and hold harmless Plaintiffs from and against the claims asserted in the Chaja Lawsuit. Under Chapter 82, Powermax is liable to Plaintiffs for their court costs, reasonable expenses, reasonable attorneys' fees and reasonable damages in defending the Chaja Lawsuit, including the payment of any amount necessary to resolve the claims brought therein. Plaintiffs hereby sue Powermax for these amounts as well as all attorneys' fees and costs of court incurred in prosecuting this suit and pre-judgment and post-judgment interest at the applicable rate.

## Second Cause of Action: Contractual Indemnity

30. Plaintiffs incorporate the allegations of paragraphs 1 through 27 above as if fully set forth herein.

31. All fan motors purchased by Plaintiffs from Powermax, including the subject Fan Motor, were purchased through the issuance of formal Purchase Orders ("PO's") which contained Purchase Order Terms and Conditions ("POTC") that were included with and made a part of each Purchase Order. Each shipment of motors Plaintiffs received was accompanied by DMA's "confirmations" which referenced the separately numbered PO's with the POTC attached.

32. Pursuant to the Uniform Commercial Code ("UCC"), the POTC are a binding and enforceable part of the transaction between Plaintiffs and Powermax. The Purchase Order Terms and Conditions state, in part:

> 12. INDEMNIFICATION. To the fullest extent permitted by law, Seller agrees to indemnify, defend, and hold harmless Buyer, its affiliates, and their respective directors, officers, employees and agents (the "Indemnified Parties") from and against all claims, demands, causes of action, losses, costs and expenses (including without limitation reasonable attorneys' fees and costs of defense) (collectively, "Losses") arising out of or incident to Seller's performance hereunder, or the presence of Seller, its employees, agents or invitees ("Seller Parties") on Buyer's premises, provided that such Losses are attributable to (a) the negligence or willful

misconduct of the Seller Parties, (b) the failure of the Seller Parties to comply with applicable laws, or (c) bodily injury, sickness, disease or death (including but not limited to bodily injury, sickness, disease or death of the employees of Seller or Buyer), or to damage to or destruction of tangible property (including the loss of use thereof); in each case regardless of whether or not caused in part by the negligence or other fault of any Indemnified Party hereunder; provided that Seller shall not be liable for Losses caused by the sole negligence or willful misconduct of any Indemnified Party.

33. Also, pursuant to the Purchase Order Terms and Conditions, Powermax provided certain express warranties:

> 9. Seller's Warranties. Seller expressly warrants that for a period of one year after Buyer's acceptance of the goods or services hereunder, or for such longer period as may be expressly provided in this Purchase Order or under applicable law, all goods and services covered by this Purchase Order will: (a) strictly conform to Seller's specifications, drawings, samples and other written materials and descriptions, or, to the extent the goods were purchased to Buyer's specifications and drawings as set forth or referred to in this Purchase Order, that the goods strictly conform with those specifications and drawings; (b) be free from defects in design, material and workmanship; (c) be of merchantable quality and suitable for the particular purposes intended, whether express or reasonably implied; and (d) bear all warnings, labels, and markings required by applicable laws and regulations. In addition, Seller warrants that: (e) none of the goods covered hereby, to the extent they are subject to laws prohibiting adulteration or misbranding, is adulterated or misbranded within the meaning of such laws as of the date of delivery to Buyer; (f) all goods covered hereby may be introduced into interstate commerce without violation of applicable laws and regulations; (g) all services have been performed in a good and workmanlike manner; and (h) all goods and services furnished or rendered pursuant to this Purchase Order have been produced, sold, delivered or rendered to Buyer in compliance with all applicable laws and regulations, including those set forth in Section 14.

34. Powermax is obligated to defend and indemnify Plaintiffs pursuant to the POTC. Powermax is liable to Plaintiffs for their court costs, reasonable expenses, reasonable attorneys' fees and reasonable damages in defending the Chaja Lawsuit, including the payment of any amount

necessary to resolve the claims brought therein. Plaintiffs hereby sue Powermax for these amounts as well as all attorneys' fees and costs of court incurred in prosecuting this suit and all applicable pre-judgment and post-judgment interest at the applicable rate.

### Third Cause of Action: Common Law Indemnity

35. Plaintiffs incorporate the allegations of paragraphs 1 through 27 above as if fully set forth herein.

36. Pursuant to Texas law, a party who may bear liability to a third person arising only out of passive actions by the party may seek indemnification from an active tortfeasor. Under the present facts, Plaintiffs' liability in the Chaja Lawsuit arose only as the passive statutory seller of the Fan Motor which was incorporated, without modification, into the subject Attic Fan. Under Texas law, the active party at fault (Powermax) must indemnify Plaintiffs, as they were an innocent retailer/seller of the component part that allegedly caused harm to the Plaintiffs in the Chaja Lawsuit.

37. Powermax is liable to Plaintiffs under Texas common law for Plaintiffs' court costs, reasonable expenses, reasonable attorneys' fees and reasonable damages in defending the Chaja Lawsuit, including the payment of any amount necessary to resolve the claims brought therein. Plaintiffs hereby sue Powermax for these amounts as well as all attorneys' fees and costs of court incurred in prosecuting this suit and all applicable pre-judgment and post-judgment interest at the applicable rate.

### Fourth Cause of Action: Breach of Contract

38. Plaintiffs incorporate the allegations of paragraphs 1 through 27 above as if fully set forth herein.

39. The PO's, POTC and PO confirmations between and among Plaintiffs and DMA, as the agent, representative and joint venturer with Powermax, created valid contracts for the sale of goods. The Chaja Plaintiffs alleged that the Subject Fan caused the fire in question. If that is true, the only possible reason would be a defect in the Fan Motor manufactured and shipped by Powermax, which was incorporated without modification into the subject Attic Fan. If the Fan Motor was defective, it was not in compliance with the contractual obligations owed to Plaintiffs by Powermax. Under the present facts, and based on the allegations in the Chaja Lawsuir, Powermax breached their contractual obligations to Plaintiffs, causing damage to Plaintiffs.

40. Powermax is liable to Plaintiffs for Plaintiffs' court costs, reasonable expenses, reasonable attorneys' fees and reasonable damages in defending the Chaja Lawsuit, including the payment of any amount necessary to resolve the claims brought therein. Plaintiffs hereby sue Powermax for these amounts as well as all attorneys' fees and costs of court incurred in prosecuting this suit and all applicable pre-judgment and post-judgment interest at the applicable rate.

## Fifth Cause of Action: Breach of Implied Warranty

41. Plaintiffs incorporate the allegations of paragraphs 1 through 27 above as if fully set forth herein.

42. Powermax is a seller of goods and is known to be a manufacturer and seller of fan motors within the industry. The fan motors manufactured by Powermax and sold to Plaintiffs constitute goods as defined and contemplated in the Uniform Commercial Code.

43. Pursuant to Texas law, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. The Chaja Plaintiffs alleged that the subject Fan Motor caused the fire in question. If that is true, the only possible reason would be a defect in the Fan Motor manufactured and shipped by Powermax,

which was incorporated without modification into the subject Attic Fan. If the Fan Motor was defective, it was not of merchantable quality. Based on the allegations in the Chaja Lawsuit, Plaintiffs have suffered actual damages for which they now sue.

44. Powermax is liable to Plaintiffs for their court costs, reasonable expenses, reasonable attorneys' fees and reasonable damages in defending the Chaja Lawsuit, including the payment of any amount necessary to resolve the claims brought therein. Plaintiffs hereby sue Powermax for these amounts as well as all attorneys' fees and costs of court incurred in prosecuting this suit and all applicable pre-judgment and post-judgment interest at the applicable rate.

## Sixth Cause of Action: Negligence and Strict Liability

45. Plaintiffs incorporate the allegations of paragraphs 1 through 27 above as if fully set forth herein.

46. Powermax designed, manufactured, and sold the subject fan motor to Plaintiffs. The Chaja Plaintiffs alleged that the Subject Fan caused the fire in question. If that is true, the only possible reason would be a defect in the Fan Motor manufactured and shipped by Powermax, which was incorporated without modification into the subject Attic Fan. If the Fan Motor was defective and caused the fire that is the subject of the Chaja Lawsuit, then Powermax is liable to Plaintiffs under principles of negligence and strict liability for the damages caused by the defective Fan Motor, the resulting fire and the subsequent Chaja Lawsuit.

47. If the Fan Motor was defective and caused the fire that is the subject of the Chaja Lawsuit, Powermax is liable for the negligent sale, distribution, supply or provision of a defective product which directly and proximately caused injury, harm, and/or damage to Plaintiffs. If the Fan Motor was defective and caused the fire that is the subject of the Chaja Lawsuit, Powermax is also liable to Plaintiffs because they negligently failed to take all steps reasonably necessary to

prevent harm and/or damage from occurring to Plaintiffs. If the Fan Motor was defective and caused the fire that is the subject of the Chaja Lawsuit, Powermax is liable for negligently selling, distributing, supplying or otherwise providing a defective product to Plaintiffs.

48. As a result of its strict liability and negligence, Powermax is liable to Plaintiffs for their court costs, reasonable expenses, reasonable attorneys' fees and reasonable damages in defending the Chaja Lawsuit, including the payment of any amount necessary to resolve the claims brought therein. Plaintiffs hereby sue Powermax for these amounts as well as all attorneys' fees and costs of court incurred in prosecuting this suit and all applicable pre-judgment and post-judgment interest at the applicable rate.

## ATTORNEYS' FEES

49. Plaintiffs are entitled to recover reasonable attorneys' fees and costs pursuant to TEXAS CIVIL PRACTICE AND REMEDIES CODE sections 38.001 *et al*.

## DAMAGES

50. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have suffered damages including:

- Attorneys' fees, costs and expenses incurred in defending the Chaja Lawsuit; and
- Attorneys' fees, costs and expenses incurred in prosecuting the instant suit.

Plaintiffs seek an award of these damages, and all future damages, as well as pre-judgment and post-judgment interest at the applicable rate.

## CONDITIONS PRECEDENT

51. All conditions precedent to Plaintiffs' recovery for the causes of action stated herein have occurred, have been performed or have been excused.

## JURY DEMAND

52. Plaintiffs hereby request a trial by jury.

## **CONCLUSION AND PRAYER**

Plaintiffs pray that Defendants be cited to answer and appear and that, following a trial by jury, they be awarded the following:

a. Judgment against Defendants for the actual damages sought above;

b. Attorneys' fees and court costs;

c. Pre- and post-judgment interest; and

d. All other relief to which they are justly entitled.

Respectfully submitted,

*/s/ Eric D. Pearson*
Eric D. Pearson
State Bar No. 15690472
eric@hop-law.com
**HEYGOOD, ORR & PEARSON**
6363 N. State Highway 161
Suite 450
Irving, Texas 75038
(214) 237-9001 Telephone
(214) 237-9002 Facsimile

**ATTORNEYS FOR PLAINTIFFS**